IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re SHARON GARNO,<br><br>Debtor. | Chapter 7<br><br>Case No. 07–bk-02480-SSC<br><br>Adv. No. 09-ap-383-SSC<br><br>(Not for Publication- Electronic Docketing ONLY)<br><br>MEMORANDUM DECISION CONCERNING PROPERTY OF THE BANKRUPTCY ESTATE AND TURNOVER OF PROCEEDS |

## I. INTRODUCTION

On January 13, 2010, this Court conducted a trial on whether the sale of a business, and any proceeds resulting therefrom, constituted property of this bankruptcy estate.[1] Jill H. Ford, the Trustee, was represented by her counsel. The Debtor, Sharon L. Garno, acted pro se. Each side presented evidence in support of their respective positions. At the conclusion of the trial, this Court advised the Debtor that the Court would rule in favor of the Trustee, based upon the evidence presented, and the Court's application of the law to the facts. The Court has

---

**1.** Ms. Garno filed her bankruptcy petition on May 30, 2007. Therefore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")(Pub.L.No. 109-8, §1501(b)(1), 119 Stat. 23, 216) applies to this adversary proceeding. The Court conducted the trial after Ms. Garno filed her answer, discovery was conducted by the parties, and other pre-trial procedures were concluded.

1

set forth hereinafter its complete findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157. (West 2009).

## II. FACTUAL BACKGROUND

The Debtor filed her voluntary petition under Chapter 7 on May 30, 2007. Ms. Ford was subsequently duly appointed as her trustee. Prior to the Debtor filing her bankruptcy petition, she formed and operated a business known as "Horse Sportz." The evidence reflects that she operated this business as a "dba," or "doing business as," as a sole proprietor. Over the years, the Debtor developed a unique saddle pad and liner, but had difficulty marketing and selling the product. The sales were mostly through "word of mouth," by individuals who had tried the product and recommended it to others. The Debtor reflects little or no taxable income from the business in the tax 2000 through 2002.[2]

The Debtor apparently encountered financial problems, commencing in 2003, when she was unemployed for a period of time in 2003, 2004, and 2005. The last product that she manufactured prepetition concerning the business was around May 2004.[3] Although the Debtor attempted to market and sell the business prepetition, she was unable to do so. Given her financial circumstances, she decided to file a bankruptcy petition. At the time that the Debtor filed her bankruptcy petition, the business was not active. However, she still retained inventory, materials, and other assets utilized in the operation of the business. Prior to filing her bankruptcy petition, the Debtor had also obtained a registered trade name of "Horse Sportz," and

---

**2.** *See* Exhibit 1. In the year 2000, the Debtor reflected a loss of $2,394 from her Horse Sportz business operations, with gross sales of $20,999; in 2001, a loss of $4,773, on gross sales of $16,430; and in 2002, a profit of $2,576, on gross sales of $35,725. The Horse Sportz business is not listed on her 2004 or 2005 tax returns.

**3.** The Debtor called Ms. Cindy Bistodeau, who confirmed that the Debtor had not manufactured product in 2004-2005. Ms. Michelle Lynn also confirmed that the Debtor had not manufactured product "in the last four or five years." Ms. Lynn, however, also recalled that the Debtor had sold her business to Mr. Pate, but could not remember the exact date of the purchase.

2

a service mark related to the business. A review of the Debtor's Schedules and Statement of Financial Affairs does not reflect (1) the prepetition operations of the business, and (2) the business assets held by the Debtor at the time of filing.[4]

On November 30, 2007, six months *after* the Debtor filed her bankruptcy petition, the Debtor sold her business and its assets to Horse Sportz Company, LLC ("Company"), for not less than $50,000. Mr. Ralph D. Pate is the principal of the Company. Afer the purchase, on December 7, 2007, the Debtor assigned the trade name to Mr. Pate, and he re-registered the Horse Sportz name with the Arizona Secretary of State, providing information concerning the trademark.[5] At the time of the sale, the parties placed a value of $5,503.67 on the inventory, and a value of $30,000 on the intellectual property being transferred.[6] The Debtor also received consultation expenses and royalty payments from the Company.[7] By December 31, 2008, the

---

**4.** *See* Exhibit K. For instance, at Schedule B(13), the Debtor lists "none" as to any interests in incorporated or unincorporated businesses; B(22), the Debtor lists "none" as to "patents, copyrights, and other intellectual property;" B(30), the Debtor lists "none" for inventory; and B(35), the Debtor lists "none" for any other personal property still held by the Debtor at the time of filing. Under Statement of Financial Affairs, Question 1, although the Debtor discloses how much income she received in the year she filed her petition, and the two years preceding the filing thereof, she does not disclose the *sources* of her income for any of the years, despite the fact that she was specifically prompted to make such disclosures. Statement of Financial Affairs, Question 18, requests that the Debtor disclose any information as to a business that she may have operated. Again, she stated "none."

**5.** *See* Exhibits A and B.

**6.** *See* Exhibit D, and Exhibits A and B thereto. A listing of the inventory transferred, at cost, is set forth on Schedule 1 to the Purchase Agreement between the parties. The original designs created by the Debtor, and transferred to the Company controlled by Mr. Pate, were also attached to the Purchase Agreement. The Agreement between the parties set an original purchase price of $50,000 for the assets, but provided that the Debtor could potentially receive additional consideration of up to $150,000, royalty payments for the Debtor's covenant not to compete as royalty payments.

**7.** Exhibit 3 reflects that, in 2008, the Debtor received the aggregate amount of $1,078.48 in consultation expenses, and the aggregate amount of $1,135 in royalty payments. In 2009, the Debtor received $655 in the first quarter; $580 in the second quarter; and $285 in the third quarter, as royalty payments. However, additional evidence presented by the Trustee

3

Case 2:09-ap-00383-SSC    Doc 28    Filed 03/24/10    Entered 03/24/10 13:36:51    Desc
Main Document    Page 3 of 8

1  Debtor had received the sum of $7,751.16 from the sale of the business.[8]

2  In 2009, the Trustee learned of the Debtor's sale of assets in 2007. She reopened
3  the bankruptcy case on March 18, 2009 , and filed the complaint commencing this adversary
4  proceeding on April 11, 2009. On July 13, 2009, the Debtor's then-attorney instructed the
5  purchaser to pay the Debtor the sum of $580, which was apparently the next royalty payment due
6  under the purchase contract between the Debtor and the Company, to the Debtor. The Debtor's
7  counsel believed that the payment must be made to the Debtor until the Trustee obtained some
8  type of turnover order from the Bankruptcy Court. The Trustee filed a Motion to Compel the
9  Debtor to turn over the payment to the Trustee, which was heard by the Court on August 11,
10 2009. The Court ordered that the funds be turned over to the Trustee, to be held in an interest -
11 bearing account by the Trustee, pending an adjudication of the issue presented in this adversary
12 proceeding on the merits. On August 28, 2009, Debtor's counsel filed a motion to withdraw,
13 which was granted by this Court.

14 Mr. Pate testified that he was in real estate sales in 2006 when he first met the
15 Debtor who was the assistant to the owner of the real estate agency. Both he and the Debtor had
16 an interest in horses. He first saw one of the saddle pads for the Horse Sportz business in 2007.
17 He liked the unique nature of the pad which wicked away moisture. He and his wife, and some
18 friends who wanted to be investors, decided to purchase the Debtor's business. Mr. Pate testified
19 that he hired an attorney who drafted the purchase agreement, dated November 30, 2007,
20 between the Debtor and Mr. Pate's Company.[9] He confirmed that the intent of the parties was to
21 transfer all assets of the Debtor's business known as Horse Sportz, including the trade secret as

---

reflects that the Debtor was paid $5,503.67, on November 24, 2007, for the Horse Sportz inventory at the time of the purchase between the parties, and the amount of $34.01 for an office expense. See Exhibit F.

**8.** *See* Exhibit F.

**9.** Mr. Pate testified that the Purchase Agreement was set forth as Exhibit D.

4

to how the saddle pad worked, and other intellectual property. The Debtor would receive royalty payments as a part of her covenant not to compete. Although the purchase price of $50,000 was never paid, he did confirm the payments to the Debtor for her inventory, consultation services, and royalty payments in the aggregate amount of $7,751.16 in 2007 and 2008. He testified that the Debtor set the price for the inventory, although he did not recall any product being turned over to him or the Company. He also stated that additional payments would be paid to the Debtor under the Agreement, but he did not believe the full amount of $200,000 would ever be paid.[10] He was not sure as to the viability of the business of his Company, noting that he had invested as much as $100,000 into the business, and the Company was still not returning a profit.

### III. DISCUSSION

Section 541 of the Bankruptcy Code provides that upon the commencement of a case under title 11, an estate is created which is comprised of all of the debtor's property, wherever located, including "all legal or equitable interests of the debtor in property as of the commencement of the case. . ." 11 U.S.C. §541(a)(1)(West 2009). Thus, when a debtor commences a proceeding, the debtor's estate is comprised of all of the debtor's interests in property, be those interest tangible or intangible. Section (a)(6) also provides that

> [p]roceeds, product, . . .or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

11 U.S.C. §541(a)(6)(West 2009). Thus, property which is acquired after the filing of the bankruptcy petition, if derived from property of the estate, is also considered estate property.

Courts generally apply a broad interpretation to the provisions of Section 541. The decision of <u>In Johnson v. Taxel (In re Johnson),</u> 178 B.R. 216, 219 (9th Cir. 1995), concerned a prepetition sale of an automobile dealership by the debtor and his corporation, which included a covenant not to compete as a part of the sale. The individual agreed not to

---

**10.** The Purchase Agreement provided for an initial payment of $50,000, with up to $150,000 being paid through potential royalty payments.

5

compete with the purchaser, for a period of five years, within a sixty mile radius of the dealership. The purchaser agreed to pay the individual the sum of $630,000, payable at the rate of $10,500 per month, for a period of sixty months. The individual subsequently filed a bankruptcy petition, and filed a motion for a determination that any payments to be made to the debtor would constitute "earnings for services" after the commencement of the case and excluded from the bankruptcy estate. The Ninth Circuit Bankruptcy Appellate Panel determined that the payments made, under the anti-competition covenant, were "sufficiently rooted in the pre-bankruptcy past to be included in the estate." Id. at 219. The anti-competition payments were a "method of paying for the value of [the debtor's] name, and for insuring that [the dealership would] receive all of the good will previously owned by [the corporation.] The good will and the value of [the debtor's] name in the . . .business were established pre-petition. Thus, the payments [were] sufficiently root in the pre-bankruptcy past to make them property of the estate." Id.

In Johnson, the debtor argued that if the payments were conditioned upon the debtor's performance, the anti-competition payments were not property of the estate. Relying on a decision from a bankruptcy court in another circuit, In re Hammond, 35 B.R. 219 (Bankr. W.D. Okla. 1983), the debtor argued that he could not be compelled to perform work or services for the benefit of creditors or his trustee in bankruptcy. The Panel rejected the Hammond test. 178 B.R. at 219. In the first step in the analysis, the Panel stated that statutory provisions must be given their plain meaning. Clearly "services performed by an individual" did not include services not performed by an individual.[11] In analyzing the nature of the sale of an interest in the business, which included a non-compete clause, the Panel noted that the nature of the transaction was to sell the debtor's interest. If the debtor had sold his interest and received immediate payment, such payment would have been an asset of the bankruptcy estate. The Panel stated that

---

**11.** The Panel noted that the services could not be considered "personal," because the debtor could comply with the covenant not compete even if he were dead. Id. at 220.

6

Case 2:09-ap-00383-SSC    Doc 28    Filed 03/24/10    Entered 03/24/10 13:36:51    Desc
Main Document    Page 6 of 8

the debtor should not be able to structure the transaction to postpone payments and somehow argue that the payments were not sufficiently "rooted in bankruptcy estate property" as to be considered property of the estate as well.[12] In reviewing the facts before it, the Panel concluded that the covenant not to compete was "part and parcel of the sale of a business." Id. Ultimately the debtor sold the good will of the business which was sufficiently rooted in property of the bankruptcy estate to also be considered property of the estate. Other courts have arrived at a similar conclusion concerning covenants not to compete. In re Bluman, 125 B.R. 359 (Bankr. E.D.N.Y. 1991).[13]

In this case, the Debtor developed her unique saddle pad over a number of years. Although the business was not active when she filed her bankruptcy petition, the facts reflect that she still possessed an interest in the intellectual property of the business, such as the trade name and the trade secret concerning the manufacture of the product, when she filed her bankruptcy petition. The Debtor also retained certain inventory from the business. When the Debtor entered into the postpetition sale of her business, which she had not disclosed on her Schedules or her Statement of Financial Affairs, she was selling all of the assets of the business, including the intellectual property of the Debtor and other intangible assets, such as the good will of the business. The Court concludes that the Debtor's sale of her business assets was a sale of bankruptcy estate property. The Debtor also received royalty payments for her covenant not to compete, which payments were sufficiently rooted in the prepetition assets of the estate as to be considered property of the bankruptcy estate.

The Debtor somehow believes that her thoughts or ideas that led to the creation of

---

**12.** The Panel was discussing the decision of In re McDaniel, 141 B.R. 438, 440 (Bankr. N.D.Fla.1992).

**13.** The court concluded that although a personal services contract was excluded from the bankruptcy estate, since it was beyond the power of the court to compel a debtor to perform under a contract based upon the 13th Amendment to the Constitution of the Untied States prohibiting involuntary servitude, the court could, by power of a negative injunction, enforce a covenant not to compete, if reasonable.

7

her saddle pad are somehow exempt under Arizona law and, hence, not property of the estate. Arizona is an opt-out jurisdiction. A.R.S. §33-1133(B)(West 2009). Therefore, if the assets of her business are somehow deemed exempt, it must be pursuant to a specific provision of Arizona law. The Court has reviewed the exemptions under Arizona law, and cannot find a provision which deems property exempt that is sold as a part of an individual's business, such as intangible property (including good will), intellectual property (a trade secret, trade name, trade mark, etc.), or a covenant not to compete.[14] Therefore, the Court must overrule the Debtor's claim of exemption as to the sale of the assets, including the royalty payments made thereunder for the covenant not to compete.

## IV. CONCLUSION

Based upon the factual findings and legal conclusions herein, this Court concludes that the sale of the Debtor's business assets postpetition constituted a sale of bankruptcy estate property. The Trustee may take steps to ensure that the bankruptcy estate shall receive the consideration from the sale of the bankruptcy estate property, including the turnover of any royalty payments which may be made pursuant to the purchase and sale agreement between the Debtor and Horse Sportz Company, LLC. The Trustee shall lodge an appropriate form of order which is consistent with this decision.

DATED this 24th day of March, 2009.

_/s/ Sarah Sharer Curley_

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

---

**14.** *See* A.R.S. §§33-1129, 1130, 1131. It is possible that if the Debtor simply provides consulting services to the Company that those services may be exempt under Arizona law. However, the Trustee is not seeking a turnover of said payments at this time.

8

Case 2:09-ap-00383-SSC    Doc 28    Filed 03/24/10    Entered 03/24/10 13:36:51    Desc
Main Document    Page 8 of 8